1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DONNELL BOYCE,                          No.  2:14-cv-1743 KJM KJN P

12                  Plaintiff,

13        v.                                 FINDINGS AND RECOMMENDATIONS

14   MICHAEL FOX, et al.,

15                  Defendants.

16

17        Plaintiff is a state prisoner, proceeding through counsel.  Defendants move to dismiss this

18   action because they contend it appears from the face of the second amended complaint and its

19   exhibits that plaintiff failed to exhaust his administrative remedies prior to filing the instant

20   action.  Defendants also move to dismiss the action based on the following three grounds:  (1)

21   defendant Fox did not personally violate plaintiff's constitutional rights; (2) defendant Fox is

22   entitled to qualified immunity; and (3) plaintiff failed to state a deliberate indifference claim

23   against defendants Kim, Wong, and Ogbodo.  As set forth below, the undersigned recommends

24   that defendants' motion to dismiss be granted in part and denied in part.

25   I. Plaintiff's Second Amended Complaint

26        Plaintiff is an African American inmate housed at Deuel Vocational Institute ("DVI") in

27   August of 2011.  Plaintiff alleges he began suffering from flu-like symptoms in early January of

28   2012, including a fever and drastic weight loss:  reducing from 207 to 130 pounds in the span of

                                              1

1    about a week.  (ECF No. 37 at 5.)  Plaintiff also experienced severe back pains, which prevented

2    him from laying down, as well as numbness in his legs, impaired mobility, and severe headaches.

3    Plaintiff was allegedly not involved in any physical altercation or accident, slip or fall, that would

4    have explained plaintiff's symptoms.  Plaintiff began requesting medical treatment on or about

5    January 4, 2012.  In response to plaintiff's complaints, Dr. Wong prescribed acetaminophen with

6    codeine phosphate (Tylenol), guaifenesin-dextromethorphan (Robitussin), and sunatriptan

7    (Migraine medication).  On or about January 17, 2012, plaintiff went "man down," and RN

8    Ogbodo gave plaintiff a hydrocodone shot for his excruciating pain.  The pain returned after 11

9    hours, and RN Ogbodo gave plaintiff two more hydrocodone shots.  Plaintiff claims that the pain

10   and previous symptoms returned almost immediately.  Plaintiff alleges that his relationship with

11   Dr. Wong was "rocky and harried," and that Dr. Wong became defensive when plaintiff

12   demanded more rigorous testing, plaintiff arguing that his symptoms were shocking based on his

13   prior great physical shape and his experience and training as a physical therapist.  Dr. Wong

14   explained that plaintiff's physical therapy experience could not equate to Dr. Wong's

15   qualification as a medical doctor, and that the prescribed medication and treatment should suffice.

16   (ECF No. 37 at 6.)

17        Dr. Wong allegedly did not order an x-ray of plaintiff's lumbar spine until February 24,

18   2012.  Dr. Wong opined that the x-ray results showed plaintiff's spine was in a healthy condition,

19   despite plaintiff's objections and pleadings.  Plaintiff attempted to obtain further medical tests

20   through the appeals process, and was provided an x-ray of his hip.

21        Plaintiff went "man down" again on May 1, 2012.  Plaintiff states that a correctional

22   officer and two other DVI personnel (likely staff nurses from the medical ward) approached

23   plaintiff, but plaintiff claims the nurses refused to transport plaintiff to medical, refused to treat

24   plaintiff in his cell because he was seen by a physician earlier that day, and claimed plaintiff was

25   faking his injury so that he could be given more prescription drugs.  (ECF No. 37 at 6.)[1]  Plaintiff

26   _____

27   [1]  Plaintiff refers the reader to his Exhibit D, which is his administrative appeal in which he
     claimed "medical" refused to pick him up, and states that the "lady in charge in main medical
     thinks it's about pills."  (ECF No. 37 at 55.)  It is unclear who was the "lady in charge", but the

28   appeal response identifies RN Ogbodo as the nurse who saw plaintiff "as" he went "man down"

1   allegedly remained on the floor of his cell, missing chow, through the night until the feeling in his

2   legs returned.

3          On May 16, 2012, plaintiff was transferred to Salinas Valley State Prison ("SVSP").  On

4   May 24, 2012, plaintiff again went "man down," and allegedly experienced five days of lower

5   back extremity paralysis, including an inability to walk, loss of sensation from the waist down,

6   and urinary and fecal incontinence.  On May 30, 2012, plaintiff was hospitalized and provided an

7   MRI of his lumbar spine, which showed a large epidural mass at the L5-S1 level with significant

8   bone destruction, and significant bony destruction confirmed both on MRI and CT scanning of

9   S1.  The spine deterioration was diagnosed as advanced stages of coccidioidomycosis.  On May

10  31, 2012, plaintiff underwent surgery at Stanford University Medical Center where his spine was

11  treated and supported with pedicle screws.  On June 28, 2012, plaintiff underwent a second

12  surgery, involving decompression and debridement of the operated area.  Medical staff at

13  Stanford opined that plaintiff would be unable to lift more than 25 pounds, requiring the

14  assistance of a cane for the rest of his life, and is hyper-vulnerable to paralysis if his body

15  experiences a traumatic blow.  (ECF No. 37 at 7.)

16         Plaintiff includes three causes of action:  First, plaintiff alleges that defendants Fox and

17  Does 1 - 5 failed to implement policies and procedures to protect plaintiff from the debilitating

18  effects of coccidioidomycosis, also known as "Valley Fever," knowing that inmates were

19  susceptible to the disease, and in deliberate indifference to plaintiff's health.  Second, plaintiff

20  alleges that defendant Dr. Wong, as plaintiff's primary care physician, was aware that plaintiff

21  lost close to 80 pounds in one week, was experiencing excruciating back pain, had numbness in

22  his legs, had a fever, and had experienced no blunt-force trauma to explain such symptoms and

23  was historically an extremely healthy individual.  Plaintiff contends that defendant Dr. Wong was

24  deliberately indifferent to plaintiff's serious medical needs, and failed to order blood tests, an

25  MRI, or refer plaintiff to a specialist, to determine the etiology of plaintiff's drastic weight loss,

26  _____

27  on May 1, 2012.  (ECF No. 37 at 58.)  However, in his pleading, plaintiff does not allege that
    defendant Ogbodo came to plaintiff's cell on May 1, 2012, or allege any other facts tying
    defendant Ogbodo to the events of May 1, 2012, (ECF No. 37 at 6), other than to allege Ogbodo

28  failed to assist him on May 1, 2012 (ECF No. 37 at 10).

1    and continuous complaints of leg numbness and excruciating back pain.  Third, plaintiff alleges

2    that defendant Ogbodo failed to assist plaintiff when he went "man down" on May 1, 2012,

3    despite knowing plaintiff had been suffering from excruciating back pain, immobility, fever,

4    drastic weight loss, and numbness in his lower extremities.

5         Plaintiff provides a patient education form, dated August 2013, that identifies the

6    following symptoms of Valley Fever:  fever, cough, tiredness, headaches, rash, joint/muscle

7    aches, night sweats, weight loss/lack of appetite, pneumonia.  (ECF No. 37 at 13.)

8         Plaintiff does not disclose his age, but the CDCR Inmate Locator website lists plaintiff's

9    current age as 36.  A previously-provided medical record reflects that after he was transferred to

10   SVSP, plaintiff's age was recorded as 32 on July 4, 2012.  (ECF No. 29 at 9.)

11   II.  Rule 12(b)(6) Standards

12        Rule 12(b)(6) of the Federal Rules of Civil Procedures provides for motions to dismiss for

13   "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In

14   considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court

15   must accept as true the allegations of the complaint in question, Erickson v. Pardus, 551 U.S. 89

16   (2007), and construe the pleading in the light most favorable to the plaintiff.  Jenkins v.

17   McKeithen, 395 U.S. 411, 421 (1969); Meek v. County of Riverside, 183 F.3d 962, 965 (9th Cir.

18   1999).  Still, to survive dismissal for failure to state a claim, a pro se complaint must contain more

19   than "naked assertions," "labels and conclusions" or "a formulaic recitation of the elements of a

20   cause of action."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-57 (2007).  In other words,

21   "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

22   statements do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Furthermore, a claim

23   upon which the court can grant relief must have facial plausibility.  Twombly, 550 U.S. at 570.

24   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

25   draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556

26   U.S. at 678.  Attachments to a complaint are considered to be part of the complaint for purposes

27   of a motion to dismiss for failure to state a claim.  Hal Roach Studios v. Richard Reiner & Co.,

28   896 F.2d 1542, 1555 n.19 (9th Cir. 1990).

4

A motion to dismiss for failure to state a claim should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief.  Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984).

III.  Alleged Failure to Exhaust

A.  Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") amended 42 U.S.C. § 1997e to provide that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory.  Porter v. Nussle, 534 U.S. 516, 524 (2002).  Exhaustion is a prerequisite for all prisoner suits regarding conditions of confinement, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.  Porter, 534 U.S. at 532.

Proper exhaustion of available remedies is mandatory.  Booth v. Churner, 532 U.S. 731, 741 (2001).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules."  Woodford v. Ngo, 548 U.S. 81, 95-96 (2006).  For a remedy to be available, there must be the "possibility of some relief. . . ."  Booth, 532 U.S. at 738.  Relying on Booth, the Ninth Circuit has held:

> [A] prisoner need not press on to exhaust further levels of review once he has received all "available" remedies at an intermediate level of review or has been reliably informed by an administrator that no remedies are available.

Brown v. Valoff, 422 F.3d 926, 935 (9th Cir. 2005).

A motion asserting an affirmative defense such as failure to exhaust may be brought under Rule 12(b)(6) or Rule 56 depending on whether the factual predicate for the motion is based on the text of the pleading or instead depends upon evidence submitted with the motion.  See Albino v. Baca, 747 F.3d 1162, 1169 (9th Cir. 2014) (en banc) ("in those rare cases where a failure to exhaust is clear from the face of the complaint, a defendant may successfully move to dismiss under Rule 12(b)(6) for failure to state a claim."); Jones v. Bock, 549 U.S. 199, 215 (2007) ("A

1  complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show

2  the plaintiff is not entitled to relief.").  The administrative process is exhausted only after the

3  inmate complies with all relevant prison grievance procedures and receives a decision from the

4  third level.  Ngo, 548 U.S. at 95-96.

5      Failure to exhaust is "an affirmative defense the defendant must plead and prove."  Bock,

6  549 U.S. at 204, 216.  In Albino, the Ninth Circuit agreed with the underlying panel's decision[2]

7  "that the burdens outlined in Hilao [v. Estate of Marcos, 103 F.3d 767, 778 n.5 (9th Cir. 1996),]

8  should provide the template for the burdens here."  Albino v. Baca, 747 F.3d 1162, 1172 (9th Cir.

9  2014) (en banc).  A defendant need only show "that there was an available administrative remedy,

10  and that the prisoner did not exhaust that available remedy."  Albino, 747 F.3d at 1172.  To carry

11  this burden,

12      a defendant must demonstrate that pertinent relief remained
       available, whether at unexhausted levels of the grievance process or
13      through awaiting the results of the relief already granted as a result
       of that process.  Relevant evidence in so demonstrating would
14      include statutes, regulations, and other official directives that
       explain the scope of the administrative review process;
15      documentary or testimonial evidence from prison officials who
       administer the review process; and information provided to the
16      prisoner concerning the operation of the grievance procedure in this
       case. . . .  With regard to the latter category of evidence,
17      information provided [to] the prisoner is pertinent because it
       informs our determination of whether relief was, as a practical
18      matter, "available."

19  Brown, 422 F.3d at 936-37 (citations omitted).

20      A prisoner may be excused from complying with the PLRA's exhaustion requirement if

21  he establishes that the existing administrative remedies were effectively unavailable to him.  See

22  Albino, 747 F.3d at 1172-73.  For example, when an inmate's administrative grievance is

23  improperly rejected on procedural grounds, exhaustion may be excused as effectively unavailable.

24  Sapp v. Kimbrell, 623 F.3d 813, 823 (9th Cir. 2010).  To satisfy this exception to the exhaustion

25  requirement, a plaintiff must show "(1) that he actually filed a grievance or grievances that, if

26  _____

27  [2] See Albino v. Baca, 697 F.3d 1023, 1031 (9th Cir. 2012).  The three judge panel noted that "[a]
    defendant's burden of establishing an inmate's failure to exhaust is very low."  Id. at 1031.
    Relevant evidence includes statutes, regulations, and other official directives that explain the
28  scope of the administrative review process.  Id. at 1032.

1    pursued through all levels of administrative appeals, would have sufficed to exhaust the claim that

2    he seeks to pursue in federal court, and (2) that prison officials screened his grievance or

3    grievances for reasons inconsistent with or unsupported by applicable regulations." Id. at 823-24;

4    see also Nunez v. Duncan, 591 F.3d 1217, 1224-26 (9th Cir. 2010) (warden's mistake rendered

5    prisoner's administrative remedies "effectively unavailable"); Brown v. Valoff, 422 F.3d 926,

6    940 (9th Cir. 2005) (plaintiff not required to proceed to third level where appeal granted at second

7    level and no further relief was available).

8         Moreover, in Bock, the Supreme Court stated that the "name all defendants" requirement

9    under the Sixth Circuit rule may promote early notice to those who might later be sued, but that

10   has not been thought to be one of the leading purposes of the exhaustion requirement.  Bock, 549

11   U.S. at 219 (citing Johnson v. Johnson, 385 F.3d 503, 522 (5th Cir. 2004) ("We are mindful that

12   the primary purpose of a grievance is to alert prison officials to a problem, not to provide personal

13   notice to a particular official that he may be sued; the grievance is not a summons and complaint

14   that initiates adversarial litigation.")).  The Supreme Court did not determine whether the

15   grievances filed by prisoners satisfied the requirement of "proper exhaustion," but concluded that

16   exhaustion is not per se inadequate simply because an individual later sued was not named in the

17   grievances.  Bock, 549 U.S. at 219 (citation omitted).

18        Recently, the Ninth Circuit clarified that  "a prisoner exhausts such administrative

19   remedies as are available under the PLRA despite failing to comply with a procedural rule if

20   prison officials ignore the procedural problem and render a decision on the merits of the

21   grievance at each available step of the administrative process."  Reyes v. Smith, 810 F.3d 654,

22   658 (9th Cir. 2016).  "Under the decision in Reyes, prisoners do not now have the right to ignore

23   the procedural requirements of the CDCR's grievance process; rather, the state now has the

24   ability to waive -- whether purposefully or inadvertently -- certain procedural defaults based upon

25   their own regulations.  This ability to waive a procedural default ripens only if "prison officials

26   ignore the procedural problem and render a decision on the merits of the grievance at each

27   available step of the administrative process." Reyes, 810 F.3d at 658."  Bulkin v. Ochoa, 2016

28   WL 1267265, at *2 (E.D. Cal. Apr. 1, 2016).  Thus, "when prison officials address the merits of a

1  prisoner's grievance instead of enforcing a procedural bar, the state's interest in administrative

2  exhaustion have been served." Reyes, 810 F.3d at 657.  This conclusion is because "[t]he

3  grievance process is only required to 'alert prison officials to a problem, not to provide personal

4  notice to a particular official that he may be sued.'" Id., quoting Bock, 549 U.S. at 219.

5        B.  Administrative Appeal Process

6        The California Department of Corrections and Rehabilitation ("CDCR") provides inmates

7  the right to appeal administratively "any policy, decision, action, condition, or omission by the

8  department or its staff that the inmate or parolee can demonstrate as having a material adverse

9  effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a).  Following

10  amendments that took effect January 28, 2011, California prisoners are required to proceed

11  through three levels of appeal to exhaust the administrative appeal process:  (1) formal written

12  appeal on a CDC 602 inmate appeal form, (2) second level appeal to the institution head or

13  designee, and (3) third level appeal to the Director of the CDCR. See 15 Cal. Code Regs.

14  § 3084.1-3084.9.[3]  A final decision from the Director's level of review satisfies the exhaustion

15  requirement under 42 U.S.C. § 1997e(a). See Lira v. Herrera, 427 F.3d 1164, 1166-67 (9th Cir.

16  2005); see also Cal. Code Regs. tit. 15, § 3084.7(d)(3) (as amended Dec. 13, 2010).

17        To initiate an appeal, the inmate must submit a CDCR Form 602 describing the issue to be

18  appealed and the relief requested to the appeals coordinator's office at the institution. Id.

19  § 3084.2(a)-(c).  An inmate must submit the appeal within 30 calendar days of:  (1) the

20  occurrence of the event or decision being appealed; or (2) first having knowledge of the action or

21  decision being appealed; or (3) receiving an unsatisfactory departmental response to an appeal.

22  Id. § 3084.8(b).  Specific time limits apply to the processing of each administrative appeal. See

23  Cal. Code Regs. tit. 15, § 3084.8.  Absent any specific exceptions, the first and second level

24  administrative responses are required to be completed "within 30 working days from [the] date of

25  receipt by the appeals coordinator," and a third level response is due within 60 working days from

26  the date the appeal is received by the appeals chief. Id.

27  _____

28  [3] The informal resolution level was eliminated. See Cal. Code Regs. tit. 15, § 3084.7 (as
amended Dec. 13, 2010).

1    C.  Plaintiff's Administrative Appeal DVI HC 12040415

2        With the second amended complaint, plaintiff provided only his first level appeal and the

3    first level response to appeal DVI HC 12040415.  (ECF No. 37 at 55-58.)  Plaintiff stated that he

4    went man down, and medical refused to pick him up.  Plaintiff claimed to have a pinched nerve in

5    his lower back, and that his right leg went out on him after using the bathroom.  (ECF No. 37 at

6    55.)  Plaintiff claimed that the "lady in charge" "thinks it's about pills," but plaintiff could "care

7    less [sic] about meds, I want my back fixed."  (ECF No. 37 at 55.)

8        Plaintiff was interviewed by his primary care physician, Dr. Wong, and his first level

9    appeal was reviewed by Chief Medical Officer Kim, on behalf of Dr. Michael Fox.  (ECF No. 37

10   at 55.)  Dr. Kim noted that before plaintiff was transferred to SVSP on May 16, 2012, his Unit

11   Health Record ("UHR"), and all relevant departmental policies and procedures were reviewed.

12   (ECF No. 37 at 57.)  In addition, plaintiff was evaluated by Dr. Wong on May 15, 2012.

13       Plaintiff's request to receive proper medical care/treatment for his back, and not to simply

14   receive medication, was "partially granted."  (ECF No. 37 at 58.)  It was determined that plaintiff

15   was seen on May 1, 2012, by A. Ogbodo, R.N., as plaintiff went "man down," stating pain

16   medications were not working, he could not move, and wanted to be seen by a doctor.  RN

17   Ogbodo documented her observation that plaintiff was "alert, oriented, in no acute distress."

18   (ECF No. 37 at 58.)  Ogbodo informed plaintiff that he was last seen on April 25, 2012, by Dr.

19   Wong, who prescribed Motrin for pain, and ordered a follow-up evaluation.  On May 15, 2012,

20   plaintiff was seen by Dr. Wong, who observed plaintiff walking around and moving with no

21   difficulty.  (ECF No. 37 at 58.)  Dr. Wong also documented that the x-rays of plaintiff's hip and

22   lumbar spine were within normal limits.  Dr. Wong instructed plaintiff to continue taking the

23   prescribed pain medication, perform self-directed physical therapy, and follow up with medical at

24   SVSP in four to six weeks.

25       Based on the above, Dr. Kim found "no evidence" that plaintiff's "medical issues were

26   not appropriately addressed" or "that proper departmental policy or procedures were not

27   followed."  (ECF No. 37 at 58.)  Because plaintiff had been transferred to SVSP, Dr. Kim

28   encouraged plaintiff to pursue any further medical concerns or issues at SVSP.  (Id.)

9

1        D. Discussion

2            Defendants first contend that based on plaintiff's failure to provide a copy of a third level

3    decision, "it can be properly inferred that he did not appeal his health-care appeal to the third

4    level of review as required for proper exhaustion." (ECF No. 38-1 at 14.)  Defendants are

5    mistaken.  As set forth above, failure to exhaust under the PLRA is "an affirmative defense" that

6    defendants "must plead and prove."  Bock, 549 U.S. at 216.  Thus, it would be improper for this

7    court to "infer" that plaintiff failed to file a third level appeal, simply based on his failure to

8    append one to his pleading, which he is not required to do.[4]

9            Second, defendants contend that the appeal demonstrates that plaintiff did not properly

10   appeal his claims because appeal DVI HC 12040415 does not allege any issues with defendants

11   Fox, Kim, Wong, or any other medical doctor at DVI, and did not raise a conditions of

12   confinement claim related to being exposed to and contracting Valley Fever.  However, as noted

13   above, the court cannot presume or infer that plaintiff filed no other appeal concerning his claims.

14   In addition, at the time plaintiff filed appeal DVI HC 12040415, it appears no one was aware,

15   including plaintiff, that he had Valley Fever.  However, plaintiff did articulate that he was not

16   drug seeking but wanted his back fixed.  In addition, the review of plaintiff's UHR would reveal

17   plaintiff's complaints of ongoing excruciating back pain, headaches, and leg numbness, as well as

18   an alleged drastic weight loss:  from 207 to 130 pounds in about a one week period.

19           Moreover, the court cannot reach the issue of whether or not plaintiff may be excused

20   from exhausting administrative remedies because his alleged failure to exhaust is not apparent

21   from the face of the operative pleading and its exhibits.  In addition, whether or not plaintiff may

22   be excused from exhausting his administrative remedies through the third level of review is more

23   appropriately addressed on summary judgment inasmuch as the parties would likely be required

24   to file additional documents, including declarations by the parties.  In addition, it is unclear

25   whether plaintiff may be excused from exhaustion based on his medical condition, including his

26

27   [4]  Indeed, plaintiff provided another appeal, DVI HC 12040144, with his opposition to the motion
     to dismiss, which this court may not consider on a motion to dismiss because it was not appended
28   to plaintiff's pleading.

1   alleged paralysis after transfer, and subsequent hospitalizations at Stanford.  See Marella v.

2   Terhune, 568 F.3d 1024 (9th Cir. 2009) (prisoner's injuries requiring hospitalization and

3   placement in the infirmary impeded his ability to obtain the necessary grievance forms to timely

4   file his grievance).  In any event, whether plaintiff is entitled to be excused from the exhaustion

5   requirement involves fact-intensive determinations more properly raised on summary judgment.[5]

6       Because the undersigned cannot find that plaintiff failed to exhaust his administrative

7   remedies by reviewing the face of the second amended complaint or the appended exhibits,

8   defendants' motion to dismiss is denied without prejudice to renewal upon a properly supported

9   motion for summary judgment.

10  VI.  Failure to State a Claim

11      A.  Deliberate Indifference to Medical Needs

12      Federal law establishes that deliberate indifference to serious medical needs violates the

13  Eighth Amendment's proscription against cruel and unusual punishment.  Estelle v. Gamble, 429

14  U.S. 97, 104 (1976)).  To prove that the response of prison officials to a prisoner's medical needs

15  was constitutionally deficient, the prisoner must establish (1) a serious medical need and (2)

16  deliberate indifference to that need by prison officials.  McGuckin v. Smith, 974 F.2d 1050, 1059-

17  60 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d

18  1133, 1136 (9th Cir. 1997) (en banc).

19      A medical need is defined as "serious" if the failure to treat the prisoner's condition could

20  result in further significant injury or the "'[u]nnecessary and wanton infliction of pain.'"  Id. at

21  1059 (quoting Estelle, 429 U.S. at 104).  A prison official is deemed "deliberately indifferent" if

22  the official knows that a prisoner faces a substantial risk of serious harm and disregards that risk

23  by failing to take reasonable measures to abate it.  Farmer v. Brennan, 511 U.S. 825, 847 (1994).

24  In order for deliberate indifference to be established, therefore, there must be a purposeful act or

25  failure to act on the part of the defendant and resulting harm.  See McGuckin, 974 F.2d at 1060;

26  Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).

27  _____

28  [5]  The undersigned expresses no opinion as to whether plaintiff may be excused from the
    exhaustion requirement.

1        Delays in providing medical care may manifest deliberate indifference.  Estelle, 429 U.S.

2    at 104-05.  To establish a claim of deliberate indifference arising from delay in providing care, a

3    plaintiff must show that the delay was harmful.  See Hallett v. Morgan, 296 F.3d 732, 745-46 (9th

4    Cir. 2002); Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059;

5    Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990); Shapley, 766 F.2d at 407.  In this

6    regard, "[a] prisoner need not show his harm was substantial; however, such would provide

7    additional support for the inmate's claim that the defendant was deliberately indifferent to his

8    needs."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  See also McGuckin, 974 F.2d at

9    1060.  In addition, a physician need not fail to treat an inmate altogether in order to violate that

10    inmate's Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir.

11    1989) (per curiam).  A failure to competently treat a serious medical condition, even if some

12    treatment is prescribed, may constitute deliberate indifference in a particular case.  Id.

13        Finally, a claim of medical malpractice or negligence is insufficient to make out a

14    violation of the Eighth Amendment.  McGuckin, 974 F.2d at 1059.  A difference of opinion

15    between a prisoner and prison medical staff as to the proper course of medical treatment does not

16    give rise to a § 1983 claim.  Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere

17    negligence in diagnosing or treating a medical condition, without more, does not violate a

18    prisoner's Eighth Amendment rights."); Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

19        B.  Defendants Fox and Does 1 - 5

20        Defendants contend that plaintiff's allegations against defendant Fox do not demonstrate

21    that defendant Fox personally violated plaintiff's constitutional rights in connection with his

22    conditions of confinement claim, and argue that defendant Fox is entitled to qualified immunity.

23        Plaintiff alleges that defendants Fox and Does 1 - 5 failed to implement policies and

24    procedures to protect plaintiff from the debilitating effects of Valley Fever, knowing the inmates

25    were susceptible to the disease.  In support of such claims, plaintiff provides a patient education

26    form that identifies eight prisons where the fungus is more common, none of which include DVI.

27    (ECF No. 37 at 13.)  Plaintiff provides the November 20, 2007 memorandum ("memo") from

28    Director Hubbard and Dr. Winslow, Statewide Medical Director, identifying eight institutions

located in a high risk (hyperendemic) area for Valley Fever:  Avenal State Prison, California

Correctional Institution, California State Prison-Corcoran, California Substance Abuse Treatment

Facility and State Prison at Corcoran, Kern Valley State Prison, North Kern Valley State Prison,

Pleasant Valley State Prison, and Wasco State Prison.  (ECF No. 37 at 48.)  The memo informs

wardens, health care managers/Chief Medical Officers, Directors of Nursing, and other

correctional staff that certain susceptible inmates cannot be housed at institutions within the

identified hyperendemic areas, if the inmate has any of the following conditions:  (a) identified

HIV infected inmate-patients; (b) history of lymphoma; (c) status post solid organ transplant; (d)

chronic immunosuppressive therapy (e.g. severe rheumatoid arthritis); (e) moderate to severe

Chronic Obstructive Pulmonary Disease (COPD) requiring ongoing intermittent or continuous

oxygen therapy; and (f) inmate-patients with cancer undergoing chemotherapy.  (ECF No. 37 at

49.)

>   The Civil Rights Act under which this action was filed provides as follows:

> > Every person who, under color of [state law] . . . subjects, or causes
> > to be subjected, any citizen of the United States . . . to the
> > deprivation of any rights, privileges, or immunities secured by the
> > Constitution . . . shall be liable to the party injured in an action at
> > law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

Monell v. Department of Social Servs., 436 U.S. 658 (1978) ("Congress did not intend § 1983

liability to attach where . . . causation [is] absent."); Rizzo v. Goode, 423 U.S. 362 (1976) (no

affirmative link between the incidents of police misconduct and the adoption of any plan or policy

demonstrating their authorization or approval of such misconduct).  "A person 'subjects' another

to the deprivation of a constitutional right, within the meaning of  § 1983, if he does an

affirmative act, participates in another's affirmative acts or omits to perform an act which he is

legally required to do that causes the deprivation of which complaint is made."  Johnson v. Duffy,

588 F.2d 740, 743 (9th Cir. 1978).

>   Although supervisory government officials may not be held liable for the unconstitutional

conduct of their subordinates under a theory of respondeat superior, Ashcroft v. Iqbal, 556 U.S.

1    662, 676 (2009), they may be individually liable under Section 1983 if there exists "either (1) [the

2    supervisor's] personal involvement in the constitutional deprivation; or (2) a sufficient causal

3    connection between the supervisor's wrongful conduct and the constitutional violation." Hansen

4    v. Black, 885 F.2d 642, 646 (9th Cir. 1989).  The requisite causal connection between a

5    supervisor's wrongful conduct and the violation of the prisoner's constitutional rights can be

6    established in a number of ways, including by demonstrating that a supervisor's own culpable

7    action or inaction in the training, supervision, or control of his subordinates was a cause of

8    plaintiff's injury.  Starr v. Baca, 652 F.3d 1202, 1208 (9th Cir. 2011); Larez v. City of Los

9    Angeles, 946 F.2d 630, 646 (9th Cir. 1991).  A plaintiff must also show that the supervisor had

10   the requisite state of mind to establish liability, which turns on the requirement of the particular

11   claim -- and, more specifically, on the state of mind required by the particular claim -- not on a

12   generally applicable concept of supervisory liability.  Oregon State University Student Alliance v.

13   Ray, 699 F.3d 1053, 1071 (9th Cir. 2012).

14          Here, the undersigned is persuaded that plaintiff has not alleged facts demonstrating that

15   defendant Fox was the moving force in the alleged violation of plaintiff's Eighth Amendment

16   rights when plaintiff was housed at DVI.  Although plaintiff alleges that Dr. Fox was

17   knowledgeable that inmates at every institution were susceptible to Valley Fever, the appended

18   exhibits contradict such a generalized statement.  Even if the court infers that Dr. Fox was a chief

19   medical officer who received the November 20, 2007 memo, the memo confirms that DVI was

20   not listed as one of the institutions located in the highest risk (hyperendemic) areas at risk of

21   Valley Fever.  (ECF No. 37 at 48.)  In addition, African American inmates were not included as a

22   group of inmates to be excluded from the state prisons located in hyperendemic areas.  (ECF No.

23   37 at 49-53.)  Rather, the memo defined susceptible inmates as those suffering other diseases.

24   (ECF No. 37 at 49.)  In addition, by 2013, such information had not changed.  The August 2013

25   patient education form still does not list DVI as located in a hyperendemic area, or include

26   African Americans as an at-risk group.  (ECF No. 37 at 13.)  Therefore, even assuming Dr. Fox

27   received the November 20, 2007 memo, the memo would not put Dr. Fox on notice that he should

28   implement Valley Fever policies or procedures at DVI when plaintiff was transferred to DVI in

14

1    2011.  Similarly, Does 1 - 5 would not have been put on such notice.  Finally, such defendants

2    could not be put on notice by findings in the "Analysis of 2011 Inmate Death Reviews in the

3    California Prison Healthcare System," because it was dated May 12, 2012, long after plaintiff was

4    placed at DVI in 2011, and shortly before he was transferred to SVSP on May 16, 2012.  (ECF

5    No. 37 at 16.)

6         In light of the evidence appended to plaintiff's pleading, it does not appear that plaintiff

7    can amend to state a cognizable claim based on an alleged failure to implement policies or

8    procedures based on an alleged risk of Valley Fever for African American inmates, including

9    plaintiff, housed at DVI in 2011 or 2012.  Therefore, defendant Fox and Does 1 - 5 should be

10   dismissed from this action, and plaintiff should not be granted leave to amend as to such claims.

11                              Qualified Immunity

12        Legal Standard

13        "The doctrine of qualified immunity protects government officials 'from liability for civil

14   damages insofar as their conduct does not violate clearly established statutory or constitutional

15   rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223,

16   231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "Qualified immunity

17   balances two important interests -- the need to hold public officials accountable when they

18   exercise power irresponsibly and the need to shield officials from harassment, distraction, and

19   liability when they perform their duties reasonably."  Pearson, 555 U.S. at 231.  "The protection

20   of qualified immunity applies regardless of whether the government official's error is 'a mistake

21   of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"  Id. (quoting

22   Groh v. Ramirez, 540 U.S. 551, 567, (2004) (Kennedy, J., dissenting)).

23        In determining whether an officer is entitled to qualified immunity, the court must decide

24   (1) whether facts alleged or shown by plaintiff make out a violation of constitutional right; and

25   (2) whether that right was clearly established at the time of the officer's alleged misconduct.

26   Pearson, 555 U.S. at 232 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  Courts are

27   "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified

28   immunity analysis should be addressed first in light of the circumstances in the particular case at

1    hand." Id. at 236.  In resolving these issues, the court must view the evidence in the light most

2    favorable to plaintiff and resolve all material factual disputes in favor of plaintiff.  Martinez v.

3    Stanford, 323 F.3d 1178, 1184 (9th Cir.  2003).

4          The measuring rod for determining whether an official's conduct violates a plaintiff's

5    constitutional right was set forth by the Supreme Court in Ashcroft v. al-Kidd, 131 S. Ct. 2075,

6    2083 (2011):  "A Government official's conduct violates clearly established law when, at the time

7    of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every

8    'reasonable official would have understood that what he is doing violates that right.'"

9    Lal v. California, 746 F.3d 1112, 1116 (9th Cir. 2014) (citation omitted).  As the Supreme Court

10   explained:

11              "We have repeatedly told courts . . . not to define clearly
                established law at a high level of generality." Al-Kidd, supra, at
12              742, 131 S. Ct. 2074. The dispositive question is "whether the
                violative nature of particular conduct is clearly established." Ibid.
13              (emphasis added). This inquiry "'must be undertaken in light of the
                specific context of the case, not as a broad general proposition.'"
14              Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596, 160
                L.Ed.2d 583 (2004) (per curiam) (quoting Saucier v. Katz, 533 U.S.
15              194, 201, 121 S. Ct. 2151, 150 L.Ed.2d 272 (2001)).

16   Mullenix v. Luna, 136 S. Ct. 305, 308 (2015).

17          Discussion

18          Defendants argue that plaintiff had no clearly established right not to be housed in the

19   endemic region or otherwise be protected from the environmental risk of Valley Fever in August

20   of 2011.  (ECF No. 42 at 7.)  Because the complaint describes an emerging public health issue

21   that public officials were seeking to understand and address, even assuming Dr. Fox had personal

22   involvement in plaintiff's housing at DVI, defendants argue that a reasonable person in Dr. Fox's

23   position would not have fair notice that relying on the Valley Fever exclusion criteria adopted by

24   the CDCR in consultation with the Receiver's office was clearly unlawful.  Plaintiff counters that

25   Dr. Fox is not entitled to qualified immunity because he violated plaintiff's clearly established

26   right to receive constitutionally adequate medical care.  (ECF No. 41 at 16.)

27          "[I]t would be impossible to conclude that a disease [like Valley Fever] that, in its severe

28   form, could lead to death does not present a risk of serious harm."  Plata v. Brown, 2013 WL

16

3200587, *10 (N.D. Cal. June 24, 2013).  "[A]n inmate's mere exposure to a dangerous condition

may provide grounds for an Eighth Amendment claim."  Beagle v. Schwarzenegger, 107

F.Supp.3d 1056, 1068 (E.D. Cal. July 25, 2014) (discussing how, under Farmer and other Ninth

Circuit cases, the correct issue is whether prison officials were subjectively aware of a serious

risk of substantial harm.).  But as another district court recently pointed out:

> Defendants are entitled to qualified immunity because it was not "beyond debate" that there was a clearly established right on March 10, 2014, for Plaintiff not to be housed in either DVI or CCI, areas with a prevalence of Valley Fever spores.  Carroll, 135 S. Ct. at 350. There was no published Supreme Court or Ninth Circuit case law that addressed whether an inmate's exposure to Valley Fever would be a violation of the Eighth Amendment. See Brown v. Oregon Dep't of Corr., 751 F.3d 983, 990 (9th Cir. 2014) (defendants are not liable for violation of a right that was not clearly established at the time the violation occurred).  Based upon the weight of authority, the Court finds that a reasonable official would not have had notice prior to March 10, 2014, that making a decision to house inmates in a location where Valley Fever was prevalent would violate an inmate's civil rights.  Accordingly, Defendants are entitled to qualified immunity, and their motion to dismiss is GRANTED on that ground.

Franklin v. Giurbino, 2017 WL 24862, at *6 (N.D. Cal. Jan. 3, 2017).[6]  See also Harvey v.

Gonzalez, 2011 WL 4625710, at *3 (C.D. Cal. July 27, 2011) (Even if the prisoner alleged that

defendants knew that the prisoner had a "far greater risk" of contracting Valley Fever because of

his ethnicity, "that still would be insufficient to state a claim that defendants deliberately exposed

the prisoner to an excessive risk of harm by housing him at [PVSP], i.e., a region at high risk for

Valley Fever exposure]."); James v. Yates, 2010 WL 2465407, at *2-4 (E.D. Cal. June 15, 2010)

(finding that failure to screen before transfer to PVSP, to warn of the risks of contracting Valley

Fever, to clean up, or move inmates away from, contaminated soil, or to approve transfer from

PVSP could not state an Eighth Amendment claim, and stating that "[e]ven assuming Plaintiff is

more susceptible to contracting Valley Fever [because of asthma and bronchitis], exposure in this

---

[6]  In Franklin, the prisoner alleged, inter alia, "that he "had a high risk medical hold on him since 2012 up to and including April 2014 in which for health reasons transferring or placing him in prisons with a high risk of valley fever infection such as [DVI] and CCI, was prohibited."  [Dkt. 1] at 7-8."  Franklin, 2017 WL 24862 at *1.  The prisoner did not allege that he contracted Valley Fever while incarcerated at either DVI or CCI.  Franklin, 2017 WL 24862 at *2.

instance is not sufficient by itself to establish a deliberate indifference claim"). The district court

in <u>Franklin</u> found that

> judges have disagreed as to whether allegations that an inmate's ethnicity increases the risk of contracting Valley Fever and developing disseminating Valley Fever states an Eighth Amendment claim. [FN 3 omitted]. Judges also have disagreed as to whether an inmate's allegations that medical conditions increase the risk of contracting Valley Fever and developing disseminated Valley Fever states an Eighth Amendment claim. [FN 4 omitted]. Numerous district court decisions filed after the date at issue, March 10, 2014, have concluded that the aforementioned disagreement among the district courts establishes that officials would not have had fair warning that the policy of housing inmates in the endemic region without taking special precautions was unlawful. <u>See Smith v. Schwarzenegger</u>, Lead Case No. 1:14-cv-60-LJO-SAB, 2015 WL 5915353, at *13 (E.D. Cal. Oct. 7, 2015) (granting defendants' motion to dismiss plaintiffs' Eighth Amendment claim upon finding defendants entitled to qualified immunity because no authority has "fleshed out 'at what point the risk of harm from [Valley Fever] becomes sufficiently substantial for Eighth Amendment purposes'");[7] <u>Nawabi v. Cates</u>, Case. No. 1:13-cv-272-LJO-SAB, 2015 WL 5915269, at *14 (E.D. Cal. Oct. 7, 2015) (same); <u>Gregge v. Yates</u>, Case No. 1:15-cv-00176-LJO-SAB, 2015 U.S. Dist. LEXIS 157616, at *38 (E.D. Cal. Oct. 7, 2015) (same); <u>Jackson v. Brown</u>, Case No. 1:13-cv-01055-LJO-SAB, 2015 WL 5732826, at *1 (E.D. Cal. Sept. 28, 2015) (granting judgment on the pleadings on qualified immunity grounds for same reasons); <u>Lua v. Smith</u>, No. 1:14-cv-00019-LJO-MJS, 2014 WL 1308605, at *2 (E.D. Cal. Mar. 31, 2014) ("[T]o the extent that Plaintiff is attempting to pursue an Eighth Amendment claim for the mere fact that he was confined in a location where Valley Fever spores existed which caused him to contract Valley Fever, he is advised that no courts have held that exposure to Valley Fever spores presents an excessive risk to inmate health.").

<u>Franklin</u>, 2017 WL 24862, at *5.

Here, plaintiff points to no authority finding that plaintiff had a clearly established right in

August of 2011 not to be housed in DVI, located in an area with a prevalence of Valley Fever

spores.  Moreover, the November 20, 2007 memo authored by Suzan L. Hubbard, Director of the

CDCR Division of Adult Institutions, and Dwight Winslow, M.D., Statewide Medical Director,

<u>Plata</u> Support Division, confirms that DVI was not listed as one of the institutions located in the

---

[7]  The prisoners in <u>Smith</u> have filed an appeal, which remains pending in the Ninth Circuit.  <u>Smith v. Schwarzenegger</u>, No. 15-17155 (9th Cir. Dec. 21, 2016) (being considered for the April 2017 San Francisco oral argument calendar).

1    highest risk (hyperendemic) areas at risk of Valley Fever.  (ECF No. 37 at 48.)  In addition,

2    African American inmates were not included as a group of inmates susceptible to Valley Fever,

3    or to be excluded from state prisons located in hyperendemic areas due to other diseases.  (ECF

4    No. 37 at 49-53.)  Rather, the memo defined susceptible inmates as those suffering from specific

5    diseases.  (ECF No. 37 at 49.)  Plaintiff does not allege that he suffered from one of the specific

6    diseases identified as placing inmates at high risk of contracting Valley Fever.

7           In Smith v. Brown, the prisoner who contracted Valley Fever in 2009, while incarcerated

8    at PVSP, alleged as follows:

9                    Smith contends that "black inmates in general are highly
                     susceptible to Valley Fever."  He also claims that each of the
10                   defendants was aware that Plaintiff was being sent to a
                     "hyperendemic" area institution, but refused to warn him of such a
11                   risk.  Plaintiff alleges that defendants failed to follow directions set
                     forth in a November 20, 2007 Memorandum regarding "Exclusion
12                   of Inmate -- Patients Susceptible to Coccidioidomycosis from
                     Highest Risk Area Institutions" that would have prevent[ed] him
13                   from acquiring Valley Fever. Plaintiff claims Defendants' actions
                     and failures to act violated the Eighth Amendment.
14

15   Smith v. Brown, 2012 WL 1574651, at *3.  Observing that "[c]ourts have found that claims like

16   plaintiff's which allege Eighth Amendment violations for contracting Valley Fever are

17   insufficient to establish an Eighth Amendment violation," the court held that "[d]efendants

18   cannot, therefore, be held liable for housing plaintiff in an area where there is a potential to be

19   exposed to Valley Fever spores."  Id. at *4.

20          This court is persuaded by the above authorities.  Because it was not clearly established in

21   2014 that housing African American prisoners at hyperendemic institutions violated their Eighth

22   Amendment rights, defendants Fox and Does 1 - 5 are entitled to qualified immunity based on

23   allegations that in 2011, plaintiff, an African American inmate, was housed at DVI, which was

24   not identified as an institution located within the hyperendemic area, even by 2013.  Thus,

25   defendant Fox and Does 1 - 5 are entitled to qualified immunity based on their alleged failure to

26   set up policies and procedures to warn him about, screen for, or protect plaintiff from Valley

27   Fever upon his placement and housing at DVI in 2011 to 2012.  Defendants' motion to dismiss

28   such claims on qualified immunity grounds should be granted.

1    V.  <u>Defendant Kim</u>

2           As noted by defendants, plaintiff's second amended complaint includes no charging

3    allegations as to defendant Kim.  Thus, defendant Kim is entitled to dismissal.

4    VI.  <u>Defendant Ogbodo</u>

5           Plaintiff identifies defendant Ogbodo as a Registered Nurse, "responsible for evaluating

6    inmates and recommending them to the primary caregiver."  (ECF No. 37 at 3.)  Plaintiff includes

7    no factual allegations supporting his claim that Ogbodo "failed to assist" plaintiff when he went

8    "man down" on May 1, 2012.  (ECF No. 37 at 10.)  Rather, he claims that a correctional officer

9    and two other personnel responded to plaintiff's cell on May 1, 2012.  Plaintiff parenthetically

10   identifies the "personnel" as "likely staff-nurses from the medical ward," and alleges "the nurses

11   refused to transport" plaintiff to medical.  (ECF No. 37 at 6.)  But plaintiff does not identify

12   Ogbodo as one of these "likely staff nurses," and he does not allege that on May 1, 2012, Ogbodo

13   responded to plaintiff's cell, refused to transport plaintiff to medical, or instructed the staff nurses

14   not to transport plaintiff to medical.  (ECF No. 37 at 6-7.)  The court and defendants are not

15   required to review the appended administrative appeal to determine plaintiff's charging

16   allegations as to defendant Ogbodo.  Plaintiff fails to allege sufficient facts demonstrating that

17   Ogbodo was aware of a substantial risk of harm to plaintiff yet failed to take steps to abate the

18   harm based on her alleged "failure to assist" plaintiff on May 1, 2012.  Absent clarifying factual

19   allegations not present here, the undersigned cannot find that plaintiff states a cognizable Eighth

20   Amendment claim as to defendant Ogbodo.

21          Moreover, it is unclear whether plaintiff can amend to state a cognizable Eighth

22   Amendment claim against RN Ogbodo.  Plaintiff does not identify RN Ogbodo as a "Director of

23   Nursing," so the undersigned is unable to infer that Ogbodo received the November 20, 2007

24   memo.  In addition, as explained above, the exhibits demonstrate that prison personnel were not

25   warned of a threat of Valley Fever at DVI, and African American inmates were not identified as

26   particularly susceptible in the 2007 memo.  Moreover, plaintiff does not allege that defendant

27   Ogbodo was the "lady in charge" who allegedly believed plaintiff was drug-seeking, despite the

28   reference to Ogbodo in the appeal response.  In addition, plaintiff's allegation that Ogbodo "failed

1    to assist" plaintiff is contradicted by the appeal response in which it was determined that on May

2    1, 2012, plaintiff was seen by Ogbodo, who noted that plaintiff was "observed to be alert,

3    oriented, in no acute distress," and "a follow-up evaluation was ordered." (ECF No. 37 at 58.)

4          In an effort to determine whether plaintiff may be able to amend his pleading to state a

5    cognizable claim against defendant Ogbodo, the undersigned reviewed plaintiff's previous factual

6    allegations against her.  In his original complaint, plaintiff stated that on May 1, 2012, he

7    submitted a second appeal alleging improper medical care/treatment for his serious medical

8    condition "after being seen by Ogbodo who determined that she observed plaintiff to be alert,

9    oriented, in no acute distress[,] and informed him that he would be seen by defendant Wong."

10   (ECF No. 1 at 7.)  In his pro se amended complaint, plaintiff included no factual allegations

11   concerning Ogbodo on May 1, 2012.  (ECF No. 15.)  However, he alleged that although Ogbodo

12   gave him a hydrocodone shot on January 17, 2012, Ogbodo alleged plaintiff was "faking his

13   illness just to get some drugs." (ECF No. 15 at 4.)  In his May 1, 2012 administrative appeal,

14   plaintiff claimed that the "lady in charge in main medical thinks it's about pills."  (ECF No. 37 at

15   55.)  In the operative second amended complaint, plaintiff now alleges that Ogbodo "failed to

16   assist" plaintiff on May 1, 2012, but does not allege that Ogbodo responded or treated plaintiff on

17   May 1, 2012.  Rather, he now claims that the unidentified nurses refused to transport or treat

18   plaintiff on May 1, 2012, because plaintiff "was seen by a physician earlier that day and that he

19   was faking his injury so that he could be given more prescribed drugs." (ECF No. 37 at 6.)  Thus,

20   plaintiff's prior factual allegations do not assist the court in determining whether plaintiff can

21   state a cognizable claim against defendant Ogbodo.

22         Although plaintiff filed his first two pleadings in propria persona, plaintiff is now

23   represented by counsel, who prepared the operative second amended complaint.  Because it is

24   unclear whether plaintiff can amend to state a cognizable Eighth Amendment claim against

25   defendant Ogbodo, the undersigned will not grant plaintiff leave to amend at this time.  However,

26   plaintiff's claims are dismissed without prejudice, should plaintiff discover facts that would

27   support filing a motion to amend under Rule 15 of the Federal Rules of Civil Procedure.

28   ////

1    VII.  Defendant Dr. Wong

2          Defendants argue that plaintiff failed to demonstrate that Dr. Wong knew, or should have

3    known, that plaintiff faced a substantial risk of serious harm, and then chose to disregard such

4    risk.  Rather, defendants contend plaintiff seeks to impose constitutional liability based solely on

5    a subsequent discovery of an abscess on his spinal cord and a Valley Fever diagnosis several

6    months after his appointment with Dr. Wong at DVI.  Defendants argue that the extent or severity

7    of plaintiff's injury does not determine the subjective component of the deliberate indifference

8    standard.  Defendants further contend that at worst, plaintiff's allegations might show Dr. Wong

9    misdiagnosed or erred in evaluating plaintiff's illness, or that the illness was undetectable when

10   Dr. Wong treated plaintiff, constituting negligence or medical malpractice, not rising to the level

11   of an Eighth Amendment violation.

12         However, plaintiff has alleged facts suggesting that the medical treatment provided was

13   medically unacceptable under the circumstances, and that Dr. Wong, plaintiff's primary care

14   physician, delayed plaintiff adequate medical care from January through May of 2012, allegedly

15   subjecting plaintiff to substantial and permanent harm.  Dr. Wong last saw plaintiff on May 15,

16   2012, the day before plaintiff's transfer to SVSP, in connection with plaintiff's administrative

17   appeal seeking further medical treatment.  (ECF No. 37 at 58.)  Based upon the claims that Dr.

18   Wong knew plaintiff suffered from excruciating back pain, leg numbness, fever, headaches, and

19   drastic weight loss (from 207 to 130 pounds in about a one week period), plaintiff states a

20   cognizable claim alleging that Dr. Wong should have earlier pursued other diagnostic tests given

21   plaintiff's prior good health, with no history of trauma that would explain his excruciating back

22   pain or drastic weight loss.  Indeed, plaintiff provides an exhibit that reflects that "progressive

23   weight loss" is "one of the most frequently mishandled 'red flags'" in type 1 lapses of care:

24   "failure to recognize, identify or adequately evaluate important symptoms or signs." (ECF No. 37

25   at 26, 45.)  Moreover, it can be argued that x-rays reflecting results "within normal limits," in the

26   face of such debilitating symptoms in an otherwise healthy man in his early thirties, should alert a

27   doctor to the need for more diagnostic tests to determine the etiology of plaintiff's excruciating

28   back pain, drastic weight loss, and other recurring symptoms.  Similarly, the provision of three

1   separate shots of hydrocodone in the span of two days, demonstrates that plaintiff was suffering

2   excruciating back pain as early as January 17, 2012.

3        While defendant Dr. Wong may be able to prove at summary judgment that his actions

4   were not deliberately indifferent, but were merely based on the latency of the illness, a

5   misdiagnosis of plaintiff's symptoms, negligence, or medical malpractice, plaintiff's allegations,

6   taken as true, are sufficient to state a cognizable deliberate indifference claim at this juncture.

7   VII.  Conclusion

8        Accordingly, IT IS HEREBY RECOMMENDED that defendants' motion to dismiss be

9   granted in part and denied in part, as follows:

10       1.  Defendants' motion to dismiss plaintiff's claims as unexhausted be denied without

11  prejudice;

12       2.  Plaintiff's claims that defendants Fox and Does 1 - 5 failed to implement policies and

13  procedures to warn him about, screen for, or protect plaintiff from Valley Fever upon his

14  placement and housing at DVI in 2011 to 2012 be dismissed, and, in the alternative, defendants

15  Fox and Does 1 - 5 be granted qualified immunity as to such claims;

16       3.  Defendant Kim be dismissed from this action based on plaintiff's failure to include any

17  charging allegations against defendant Kim;

18       4.  Plaintiff's claims against defendant Ogbodo should be dismissed without prejudice;

19  and

20       5.  Defendant Dr. Wong's motion to dismiss be denied, and Dr. Wong be required to file

21  an answer within fourteen days of any district court order adopting these findings and

22  recommendations.

23       These findings and recommendations are submitted to the United States District Judge

24  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

25  after being served with these findings and recommendations, any party may file written

26  objections with the court and serve a copy on all parties.  Such a document should be captioned

27  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

28  objections shall be filed and served within fourteen days after service of the objections.  The

1  parties are advised that failure to file objections within the specified time may waive the right to

2  appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3  Dated:  January 27, 2017

4

5  KENDALL J. NEWMAN
   UNITED STATES MAGISTRATE JUDGE

6

7  /boyc1743.mtd.fte